[No. 24105. Department Two. January 7, 1933.]

F. W. FITZPATRICK et al., Appellants, v. G. R. BRADSHAW et al., Respondents.[1]

*John C. Hurspool,* for appellants.

*Moulton & Powell,* for respondents.

[1] Reported in 17 P. (2d) 894.

STEINERT, J.—This is an action to recover a real estate broker's commission alleged to have been earned, and to be due, under a written agreement involving the exchange of certain real estate. Trial was had before the court without a jury. The court made its findings of fact and conclusions of law, based upon which it subsequently entered its judgment dismissing the action. The plaintiffs have appealed.

On July 19, 1929, the written agreement on which this action is founded was executed. The agreement, in so far as it is material, reads as follows:

"THIS AGREEMENT IN TRIPLICATE made and entered into this 19th day of July, 1929, by and between G. R. Bradshaw and Collie Bradshaw, husband and wife, hereinafter called the first party, and B. W. Wright, a widower, hereinafter called the second party, and the undersigned brokers,

"WITNESSETH: That the first party agrees to sell and convey unto the second party, and the second party agrees to purchase from the first party at and for a purchase price of Ten Dollars and other valuable consideration ($10.00), that certain property described as follows, to-wit:—

[Here follows description of property in Benton county, Washington]

"And in payment of the purchase of the above described property, the second party agrees: (a) . . . (b) . . . (c) And to sell and convey to the first party, and the first party agrees to accept from the second party at and for an agreed price of $................
Exchange, that certain property described as follows:
[Here follows description of property in Walla Walla county, Washington] . . .

"And in consideration of the mutual promises herein contained, it is further agreed that should either party hereto fail to perform and carry out his part of this agreement, such party so failing, shall pay all of the brokers' commission below provided for, this promise being made directly for said brokers' benefit.

"The undersigned brokers agree to aid and assist in consummating the foregoing exchange. [At this point appear the signatures of respondents and Wright and opposite thereto the firm name of Fitzpatrick, Thorp & Creek, in typewriting.]

"I hereby ratify and confirm the employment of Fitzpatrick, Thorp & Creek, real estate broker, to find and procure a purchaser for my property above described and in consideration of services performed by said broker in negotiating and bringing about the foregoing sale, hereby agree to pay said broker forthwith a commission of Two Hundred and no/100 Dollars. [Followed by the signatures of respondents and Wright.]"

The last three quoted paragraphs raise the questions with which we are here concerned, particularly the last when read in connection with the other two. The contract was upon the stereotyped printed form used by the firm of Fitzpatrick, Thorp & Creek, brokers.

After the agreement had been signed, abstracts of title passed between the parties. The abstract covering Wright's property proved satisfactory to respondents. The abstract covering respondents' property showed several defects, one of which was an outstanding contract affecting the property; another, an easement for a pole line; and a third, a bonded indebtedness against the irrigation district in which respondents' land lay. It also showed some other defects, but these were of minor importance.

After the abstracts had been examined, and objections raised by Wright's attorney on the above defects, the respondents and Wright, on August 31, 1929, entered into a supplemental agreement which provided, among other things, that action should be taken by respondents to quiet their title against the outstanding contract on their property. At the time of entering into the original agreement, Wright had seen the poles and wire constituting the pole line extending across re-

spondents' land, and also knew that the land was irrigated. At the time that the supplemental agreement was made, Wright knew, through the examination of the abstract by his attorney, that the pole line constituted in law an easement on the land, and that the irrigation district bonded indebtedness amounted to five hundred thousand dollars. It may be added that none of this general indebtedness has ever become a special lien by assessment against respondents' land. Before signing the supplemental agreement, Wright made some further inquiry regarding the bonded indebtedness.

After respondents had quieted their title against the outstanding contract, the abstract was extended and then sent to Wright's attorney; he, however, stood upon his original objections concerning the easement for the pole line and the irrigation district indebtedness. Thereupon, respondents, claiming that they had performed their part of the agreement as finally made, instituted an action against Wright for specific performance on his part. That action was subsequently dismissed upon stipulation. Appellants then began this action against respondents to recover the total amount of commission on the exchange.

Our first problem necessitates a construction of the terms of the original written contract set out above. It is the contention of appellants that the provision calling for payment of the commission *forthwith* compels the interpretation that the money became due and owing upon the signing of the contract. It is the contention of respondents that its payment was to be postponed until the consummation of the exchange.

■ It is *our view that* respondents' contention must be sustained. Reading the instrument as a whole, it seems clear to us that the payment of the

commission was to be deferred until the exchange of the properties had been perfected, since only then could it be determined whether any default had been made by either party, and if so, who the defaulting party was. The instrument indicates that the appellants agreed not only to procure a purchaser, but also to assist in consummating the exchange. The contract related not only to the nature of performance by appellants, but to the time of performance as well. It contemplated the negotiation and the "bringing about" of the sale of each piece of property by the consummation of an exchange of the two. The transaction was not complete until the exchange had been fully consummated, or else the fact of, and liability for, default had been determined.

Even though the situation as it later developed was such as left nothing which the appellants themselves could remedy, nevertheless the only reasonable construction that can be placed upon the wording of the contract is that it was intended that if, and when, the exchange was fully consummated, then the commission was to be paid forthwith, and by each party *pro tanto;* but if it failed, then the defaulting party should be liable for the whole of it. Had the commission been due and payable immediately upon the signing of the contract, as appellants contend, there would have been no need for reference to future assistance by appellants, for their active agency would have already ceased, and, so far as they were concerned, their part of the contract would already have been fully performed. The form of this very action indicates appellants' own construction of the contract.

But if the instrument does not lend itself to that degree of certainty implied in our construction of it, and if it falls within the realm of ambiguous or uncertain agreements, then the fact still obtains

that appellants prepared and supplied the form of contract which the parties signed. They must, therefore, accept that one of two constructions which is the less favorable to them. *Clise Investment Co. v. Stone,* 168 Wash. 617, 13 P. (2d) 9; *Westby v. Pacific Silicate Co.,* 169 Wash. 665, 14 P. (2d) 966; *National Grocery Co. v. Pratt-Low Preserving Co.,* 170 Wash. 575, 17 P. (2d) 51. The construction which is the less favorable to appellants is the one that we have already placed on the instrument. So, then, the result is the same, in either event.

Our next problem concerns the situation that existed when the exchange agreement failed of consummation, that is, whether the fault lay with respondents or with Wright. The record amply discloses, we think, and the trial court so found, that, when the supplemental agreement was entered into, Wright was then fully conversant with the conditions respecting the pole-line easement and the general bonded indebtedness of the irrigation district. The easement was a permanent one, and its removal presented an impediment which, from a practical standpoint, it was impossible to overcome. The bonded indebtedness had not been, and could not be, so segregated as to determine what portion would ultimately become a specific lien on respondents' land through special assessment.

In the face of this, however, and after personal inquiry, Wright entered into the supplemental agreement which required respondents to incur the trouble and expense of instituting, and concluding, an action to quiet title respecting another defect altogether. His conduct as to part, and his silence as to the rest, of the features originally objected to, constituted a waiver of further objection thereafter. So far as respondents were concerned, under the evidence now

before us, they had done all that was ultimately required of them by Wright in order to give good title to their land.

When the solution of the two problems which we have referred to are put into apposition, the conclusion must follow that it established the fact that consummation of the exchange failed through no fault of respondents, and that hence they are not liable to appellants for any of the commission.

The judgment is affirmed.

TOLMAN, C. J., MAIN, and BEALS, JJ., concur.